(5 Misc. Rep. 501.)

### BUFFALO PRESS CLUB v. GREENE.

(Superior. Court of Buffalo, Trial Term.  November, 1893.)

CONTRACTS—CONSIDERATION—COMPOUNDING FELONY.
> One L., being in custody on a charge of larceny from plaintiff club, offered to make restitution if he was "given a chance." The president of plaintiff, in stating the proposition to the club, which was that L. would pay a certain sum in cash and give security for the balance, said that it would be expected, in the event of acceptance, to withdraw the criminal proceedings. Afterwards, an interview was had with the district attorney, and, at the request of the officers of plaintiff, L. was released on his own recognizance. *Held*, that a bond given by L., pursuant to such arrangement, with defendant as surety, to secure payment to the club, was void as compounding a felony, within Pen. Code, § 125.

Action by the Buffalo Press Club against Greene on a bond. Complaint dismissed.

Simon Fleischmann, for plaintiff.
Frank C. Laughlin, for defendant.

TITUS, C. J.   This action is brought by the plaintiff to recover against the defendant on a bond bearing date the 6th day of June, 1890, made by the defendant and others to secure the payment to the plaintiff of the sum of $900, which one Charles L. Lancaster owed to the plaintiff by reason of misappropriation of the funds as treasurer some time previous to 1890.   It appears that Lancaster had been elected treasurer of the plaintiff, and during the time he held office he misappropriated about $1,000.   A discovery of his defalcation was made about the 1st of April, 1890.   At that time he had ceased to be treasurer, and his successor had been elected, and taken possession of the office.   The bond on which this action is brought was given to indemnify the club against the loss which it had sustained by the misconduct of Lancaster.   The defense is, in brief, that the consideration for the giving of the bond was the release of Lancaster, and an agreement not to prosecute him for the felonies for which he had been indicted, and, being against public policy, is void.   A reference to a few cases bearing upon the law governing the case will show what the tendency of the courts is in the direction of holding such contracts illegal.   It is laid down as an elementary proposition that, if the consideration to a contract is illegal, the contract will not be enforced, being against public policy, or, if it is in contravention to the positive provisions of a statute law, it will be invalid.   2 Kent, Comm. 465.   The illegality of a contract, however, will not be presumed, but everything must be presumed to be legally done till the contrary is shown.   Porter v. Havens, 37 Barb. 343; Barrett v. Weber, 125 N. Y. 18, 25 N. E. 1068. But, if the legality of the contract does not appear on the face of the instrument, it may be shown by parol testimony; and this, whether the contract is under seal, or a mere unsealed written instrument.   Brown v. Brown, 34 Barb. 533.   The cases are numerous, and are found in the reports of all the states, that contracts given to prevent the prosecution of offenders or to stifle investigation

are void, as against public policy. In this state, as in most of the other states, the statute has expressly prohibited and made it a felony to compound or conceal a crime. Section 125, Pen. Code, provides that "a person who takes money or other property, gratuity or reward, or an engagement or promise therefor, upon an agreement or understanding, express or implied, to compound or conceal a crime, or a violation of statute, or to abstain from, discontinue or delay a prosecution therefor, or to withhold any evidence thereof, except in a case where a compromise is allowed by law, is guilty of a felony." This is but the terse enactment of the common law upon that subject, for in the absence of the statute, under the authorities, a contract, the consideration of which is given in violation of law, is against public policy, and therefore void. Bank v. Mathewson, 5 Hill, 249; Porter v. Havens, 37 Barb. 343; Conderman v. Hicks, 3 Lans. 108; Conderman v. Trenchard, 58 Barb. 165; Fellows v. Van Hyring, 23 How. Pr. 230. The cases cited by the learned counsel for the defendant from the reports of other states accord with the rule above stated, and are in harmony with the authorities in this state. Riddle v. Hall, 99 Pa. St. 116. In Buck v. Bank, 27 Mich. 293, Judge Cooley, in writing the opinion of the court, says:

"The highest considerations of public policy demand that the pecuniary interests of individuals should not be recognized as legitimate motives to influence the action of official persons. * * * That the defendants below were entitled to have the jury instructed that if the signatures to the notes were obtained by assurances on the part of the officers of the bank, or any one of them, that, if the parties would give the notes, the officers, or any of them, would sign a petition to the judge for clemency to Buck in his sentence, or that they would be more likely to do so, or that in any manner they would exercise, or be more likely to exercise, influence with the court to secure a lighter sentence, then the promise of the defendants expressed in the notes was based upon a consideration opposed to public policy, and consequently void."

A number of cases referred to by the defendant's counsel in his brief, reported in other states, have been examined, and quite unanimously held to the doctrine as stated by Judge Cooley. It is not questioned that these cases correctly state the law, but it is claimed that Lancaster was owing the plaintiff money which might have been collected in a civil action, and that it was not a violation of law to take the bond of the defendant and others, friends of Lancaster, agreeing to pay his debt; that the transaction was entirely innocent, —not related to any unlawful agreement to stifle prosecution or compound a crime. If this is a correct statement of the transaction, then the bond is valid, and can be enforced, because there is no principle of law that prevents a person deprived of his property by the wrongful or felonious act of another from maintaining an action in a court of law to recover the value of the property, or from taking such security as is necessary to insure full indemnity to the injured party. This, of course, must be accompanied with the fact that there is no promise or understanding that the injured party will abstain from prosecution for the criminal offense.

In this view of the case, and the claim made by the learned

counsel for the plaintiff, it is necessary to examine the evidence, and see what the transaction in fact was. Charles L. Lancaster was treasurer of the Buffalo Press Club, and in April, 1890, had become a defaulter in about the sum of $1,000. Officers of the club went before the grand jury, and procured his indictment on two charges,—one for grand larceny, and one for forgery. In the mean time, Lancaster had left the country, and gone to Canada. About May 1, 1890, Mr. Vought, the president of the plaintiff, accompanied by an officer, went to Canada, and arrested and brought him back to this city, he consenting to come without being formally extradited. He was placed in jail, where he remained, unable to get bail, for about six weeks. After his arrest, he expressed contrition for what he had done, and manifested a desire to make restitution to the club, so far as it lay in his power, "if he was given a chance." His wife was to give $500 in cash, and security was to be given for the balance. The president, in his report to the club of the arrest and of the proposition of Lancaster, says:

"Of course, it is expected that in the event of an acceptance of this proposition, an effort will be made to have all criminal proceedings withdrawn, if the district attorney can be prevailed upon to consent to such an arrangement. It seems to me that if it can be satisfactorily arranged for both parties, it will be a matter of pecuniary benefit to the club for the board to assent to the plan, and my recommendation is that the whole subject be referred to Simon Fleischmann as our attorney, he to report to the board before any concluding action is taken."

The communication was referred to Mr. Fleischmann, the attorney, as recommended by President Vought. Later, and on the 26th day of May, Lancaster made a formal proposition for settlement in writing. It differed somewhat from the other. Instead of paying $500 in cash, he proposed to pay but $100 in cash, and to sign an agreement to pay $10 a week, providing he could get a salary of not less than $20 a week, or, in case he received less, he would pay one-half of his weekly salary, to begin as soon as he could obtain employment; and as a further security he proposed to give a bond, the bondsmen to pay at the end of two years whatever balance remained unpaid, with interest, each bondsman to bind himself in certain stated amounts, and not to be liable for a greater sum. He further stated that he had not a dollar in the world, and asked, for the sake of his wife and children, to be given a chance to pay this debt. This communication came before a meeting of the club, and, after discussion by the members, a resolution was adopted that a committee, composed of the president, Attorney Fleischmann, and Chairman Barnum, be appointed to confer with the district attorney, with a view to secure the release of Lancaster from custody on such terms and under such restrictions as shall be for the best interests of the club, and that they advise Lancaster that he present funds or security for the same for the full amount of his deficit to the club. Subsequently, the committee reported that they had called on the district attorney and stated the wishes of the club; that he informed them that, if Lancaster would make a satisfactory settlement with the club, the prosecu-

tion would be suspended, and he would be admitted to bail on his own recognizance; that Lancaster had stated that he would pay $100 in cash, and give a bond for the balance, $900. At this meeting, Lancaster was present in the custody of an officer, and was given an opportunity to state what he intended to do, which was practically the same proposition as the one submitted in writing. A copy of the proposed agreement with Lancaster was then adopted, providing, in substance, for the acceptance of Lancaster's proposition, he to pay $100 in cash, and give a bond for $900, which, when executed and approved by the attorney of the club, the committee was instructed to consult the district attorney to secure the release of Lancaster from custody on his own recognizance. This proposition of Lancaster was on condition of his release from custody. The bond upon which this action is brought was subsequently executed and presented to the board, and approved, and the president was authorized to sign it. Subsequently a formal agreement was entered into with Lancaster by the officers of the Press Club, and they thereafter appeared in court, and requested the release of Lancaster on his own recognizance, and, as the district attorney states, "it was their desire to have this man released on his own recognizance, so that he could go to work and pay his debt." After his release, Lancaster went to Cleveland, where he obtained employment, and for a time made payments under his agreement with the plaintiff, but stopped paying, and a large sum is still owing the plaintiff,—more than the amount of the defendant's liability on his bond. The bond given by defendant and others to the Press Club is an ordinary bond for the payment by Lancaster of the sum of $900, on condition that the Press Club shall forbear enforcing the collection of said sum against Lancaster for two years, and expresses a nominal consideration of $1. The sum which the defendant agrees to pay is $50. The bond on its face does not mention the criminal proceedings against Lancaster, and is not on its face void as contravening any statute, nor as being against public policy. But we are to determine the question as to what the true consideration was, not alone from the bond, but from all the evidence in the case, from the circumstances surrounding the giving of the bond, and the undertaking of the plaintiff and Lancaster at the time, and if it was given in consideration that the plaintiff would abstain from prosecuting him criminally on the charges for felony, which were then pending against him, it would be invalid, notwithstanding it is fair and valid on its face. Brown v. Brown, 34 Barb. 533. The legal presumption is in favor of the bond; but it is not conclusive, and it may cover an illegal consideration, and such a fact may be shown by parol evidence.

The question, then, is, from all the facts shown upon the trial before me, is this bond valid? I have made a careful examination of the evidence, and of the authorities cited by the learned counsel for the plaintiff, with a view to arriving at a correct conclusion, so far as I may be able to do, as it was stated on the trial that this was a test case, the decision of which would necessarily influence action in other cases brought, or to be brought, against

parties signing this same instrument. I do not think the cases
cited bear out the construction put upon them by counsel for the
plaintiff. The rule is everywhere recognized that agreements to
forbear prosecution or of bringing indictments to trial, or for the
purpose of withholding or suppressing evidence against a party
charged with crime, or to interfere with the course of justice so as
to prevent the enforcement of the law in criminal actions, are con-
trary to public policy and void, and I therefore conclude from the
evidence that the contract was given for an illegal purpose, and
is invalid. The defendant is not a party to such an illegal under-
taking, and may interpose it as a defense to this action. The
parties stipuated in open court, on the trial of the action before
me, that, whichever way the case was decided, no costs should be
given to the prevailing party. The plaintiff's complaint should
be dismissed, but without costs.